UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-14035-CR-MARTINEZ

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

FRANCISCO FRANCISCO-MATEO,

     Defendant.

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW defendant, Francisco Franciso-Mateo, by and through his appointed counsel, Kafahni Nkrumah, pursuant to Federal Rule of Criminal Procedure 32, Local Criminal Rule 88.8, and USSG § 6A1.2(b), and submits the following position with respect to sentencing in this case.

**I.**    **Defense Counsel Certification**

Undersigned counsel and Mr. Francisco-Mateo have reviewed the draft Presentence Investigation Report ("draft PSR").  Counsel has communicated the following position to the probation officer and Assistant United States Attorney in the form of a copy of this document.

**II.**    **The Sentencing Hearing**

The sentencing hearing will last approximately 30 minutes.

III.   **Sentencing Factors in Dispute**

A.   **Factual Objections, Corrections, and/or Comments**

Mr. Franciso-Mateo has no objections, corrections, and/or comments regarding the factual part of the presentence investigative report.

B.   **Legal Objections**

Mr. Franciso-Mateo has no objections, corrections, and/or comments regarding the legal part of the presentence investigative report.

IV.   **Offense Circumstances**

On May 26, 2025, Mr. Francisco-Mateo was stopped while riding in a work truck with other individuals by Florida Highway Patrol Trooper Petrofsky. After stopping the vehicle and getting identification from the front two passengers but Mr. Francisco did not any identification. Trooper Petrofsky contacted Immigration and Customs Enforcement Deportation Officers Anderson and Blumsack. When the deportation officers arrived, Trooper Petrosky ordered Mr. Franciso to open the rear door. He didn't comply at first and moved side to side in the back passenger seat area of the truck. After initially not complying, Mr. Francisco-Mateo opened the rear door, and Trooper Petrofsky entered the vehicle and forcibly removed Mr. Francisco-Mateo. After being taken out of the truck, with his shirt being pulled over his head and being placed in a headlock by Trooper Petrofsky, Mr. Francisco-Mateo did not initially go to the ground. He was eventually forced to the ground, and after being tased by Trooper Petrofsky five (5) times, they were able to place him under arrest.

On June 23, 2025, an information charging Mr. Franciso with one count of resist, oppose, impede, intimate, or interfere with a federal officer. [DE 12].  On August 20, 2025, the defendant pled guilty to count one of the one-count information, has fully allocated in open court, and accepted full responsibility for his actions [DE 26].

## V.   **Position as to Sentencing**

### a.   **Personal Circumstances**

Mr. Francisco Franciso-Mateo is a thirty-eight-year-old Guatemalan national born into the circumstances of extreme poverty, the difficulties of rural life in Guatemala, and a country with political and economic instability.  Mr. Francisco-Mateo's father, Pascual Francisco-Juan worked in the fields and hardly spent any time with him.  Mr. Franciso-Mateo raised him and his siblings as in a single parent home.  He describes his conditions growing up in extreme poverty.  "We lived in a clay home that had one bedroom and a living room.  I slept in the living room with my siblings and my mother slept in the room.  Because my family didn't have any money, we didn't sleep in beds, we sleep on the dirt floor."  We didn't have running water, gas, or electricity and there were plenty of days when we didn't have anything to eat."

Both his mother and father still live in Guatemala.  Part of the reason why he came back to America was so he could help to support his mother.  His siblings also reside in Guatemala although he has not had any contact with his sisters since he left home and came to the United States at age 14.  Mr. Franciso-Mateo has been in a relationship with his partner, Ms. Anna Diaz, for the last four years.  They share

two daughters, Aurelia Franciso Perez, age 3, and Juana Francisco Perez, age 2.  He also has a son that is an American citizen who resides with his mother in Alabama and is also part of the reason why he returned to America, to help care for his son.

The type of poverty that Mr. Francisco-Mateo was raised under is eye-opening and are conditions that no one should have to grow up in, not here in America or in Guatemala, but are the reality for far too many individuals in both countries.  In an article from the Borgen Project[1], described as one of the leading "nonprofit organizations that is addressing poverty and hunger and working towards ending both," the project gives us an idea of the amount of poverty faced by rural Guatemalans from birth:

> "Poverty in Guatemala is disproportionately high for the country with the largest economy in Central America; while Guatemala had a Gross Domestic Product (GDP) of $75.62 billion in 2017, it also has the second-highest poverty rate in the Americas. Since 2006, poverty has grown. Approximately 2 million people slid below the poverty line (measured by an income of less than $5 USD per day) from 2006 to 2014. During the same window of time, around half a million slipped into extreme poverty ($1.90 USD or less per day). According to a national survey, the poverty rate among indigenous, predominantly rural communities is as high as 79%."

The article goes on to further describe how this poverty is exacerbated through the poor distribution of resources:

> "Extreme socioeconomic and geographic inequality largely characterizes the nature of poverty in Guatemala. As many as eight in 10 citizens living in rural municipalities live in poverty. One study found, from a sample of six other Latin American countries, that Guatemala had the poorest distribution of health and educational resources. Access to health resources and quality

---

[1] Brogenproject.org, Poverty in Guatemala, http://borgenproject.org/poverty-in-guatemala-2/ (last visited March 8, 2022).

education is key in enhancing social mobility and bringing individuals out of poverty. Poor distribution of these resources in rural areas *fortifies the regional cycle of poverty* between contributing to lower life expectancy and limiting opportunities for education.

Additionally, chronic malnutrition debilitates poor Guatemalan communities; the level of malnutrition in Guatemalan children— *47% as of 2019*—is the highest of all the Latin American countries, and among the *highest globally*. This aggravates the cycle of poverty as well. Malnutrition burdens the already-limited health care system and stunts the local economic potential by reducing the physical and intellectual capability of youth. While many families traditionally subsist on agriculture to feed themselves, chronic drought has left many of these communities fully reliant on overseas remittances for survival."

In another more recent article from the Brookings Institution entitled *Rural poverty, climate change, and family migration from Guatemala,*[2] the article discusses the increase in apprehensions of people from Guatemala arriving in family units at the U.S. Southern Border grew exponentially between 2012 and 2019-from just 340 to a whopping 185,134 persons.  The article explains that this increase happened before the pandemic, the 2020 hurricanes that devasted parts of Central America, and before President Biden was elected.  The article also states that the conditions driving migration predate these events and still exist today and-without an adequate policy response-seem set to continue.

"Almost half of all people in Guatemala live in poverty and, the poverty rate rises to nearly 80 percent for indigenous people, who make up more than 40 percent of the country's population. Guatemala has the highest levels of childhood stunting in Latin America and the sixth highest levels in the world… Frequent

---

[2] Sarah Bermeo, David Leblang, and Gabriela Nagle Alverio, Rural poverty, climate change, and family migration from Guatemala (2022), www.brookings.edu/blog/future-development/2022/04/04/rural-poverty-climate-change-and-family-migration-from-guatemala

droughts linked to climate change in the Dry Corridor have significantly affected the agriculture sector, which employs one-third of Guatemalan workers... The three departments with the highest numbers of apprehensions are Huehuetenango, Quiche, and San Marcos-all located in the Western highlands.... Our results show that a higher share of rural population in a department is associated with more family migration. An increase in the percent of people in a department living in rural areas from 37 percent (10th percentile) to 60 percent (75 percentile) is associated with a 136 percent yearly increase in apprehensions...."[3]

The article goes on to explain why internal migration is only desirable to a small percent of Guatemalans:

"Our analysis shows that higher levels of homicides per capita are associated with increased apprehensions in some areas of the country. When the homicide rate increases from the 10th percentile to the 75th percentile in departments outside of the Dry Corridor, the apprehension rate increase by 72 percent. There is no significant correlation between homicides and apprehensions for departments in the Dry corridor, consistent with the interpretation that rural poverty and agricultural stress linked to climate change are more important drivers of migration from this region. These findings do not capture the indirect impact of violence on migration. People who leave their homes have a choice to migrate internally or externally. High levels of violence in some Guatemalan cities, control of parts of the country by drug trafficking organizations and gangs, and increasing rates of extortion, along with factors such as strong ties to the U.S. from previous migration, ...."[4]

The effect that prior American policy has had, and continues to have, on the problems that Guatemalans and other migrants from the Americas encounter in their countries are just some of the circumstances that these migrants face when they make the difficult choice of leaving their homelands and families. "The Biden

---

[3] *Id.*
[4] *Id.*

administration proposed $4 billion in U.S. foreign aid to Central America to address the root cause of migration… This investment will require progress in rooting out the interacting scourges of corruption, drug trafficking to *meet demand in the U.S.*, gang violence, and the flow of guns into Central America *from the U.S. market*."[5]

Raised in conditions such as these and then watching as your family struggles with their daily survival, attempting to overcome these circumstances that were imposed on you long before you were born, hopefully these conditions may one day reverse themselves and significantly slow migration from the country. But that hope doesn't help Mr. Francisco-Mateo at this present time and the conditions for him were so dire that it forced him to leave his home and family to try and help support them.

These conditions were not of Mr. Francisco-Mateo making, nor of his families doing. He did not make bad choices; he made the only choice available to him at the time in an attempt to help his family. With so many other Guatemalans' here already in this country, coupled with the interference of America in his country's governance, these circumstances should be viewed as mitigating circumstances in this matter and considered by this court.

Mr. Francisco-Mateo is not before this Court to illegal reentry, but upon his plea of guilty to resist, oppose, impede, intimate, or interfere with a federal officer 18 U.S.C.§ 111(a)(1) a misdemeanor offense based on his interactions with law enforcement on May 26, 2025. This encounter with law enforcement began because he was riding in a work truck with his co-workers, probably heading to a job, and

---

[5] *Id.*

ended with an encounter that turned physical, an encounter that saw Mr. Franciso-Mateo being abused after he was handcuffed by law enforcement.  Based on §3553(a) factors, Mr. Francisco-Mateo respectfully request this Honorable Court to sentence him to a sentence of time served, with a period of supervised release to follow.  Mr. Francisco-Mateo believes that this is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in § 3553(a).

Mr. Francisco-Mateo would like this court to be aware that he does not offer his life experiences to this court as an excuse for his conduct.  It is being offered as mitigation evidence, which United States Supreme Court case law, and statutory authorities clarifies, "… is not being provided as an excuse or justification for engaging in criminal conduct, but rather for the purpose of mitigation as to the length of sentence or type of punishment to be imposed as a result of that criminal conduct." See *Lockett v. Ohio*, 438 U.S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); See also, 18 U.S.C. § 3661 and 21 U.S.C. § 850.[6]

---

[6] Evidence about the defendant's background and character is relevant because of the belief, held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, concurrence).

*Application of § 3553(a)*

It is "the stated purpose of sentencing, that the sentence be sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2). For Mr. Francisco-Mateo this commandment justifies a sentence of time served.

This Court's obligation under 18 U.S.C. § 3553(a)(2) to consider carefully, the need for the sentence to "reflect the seriousness of the offense; to promote respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and also "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, is an obligation that is imposed by law. 18 U.S.C. § 3553(a)(2). A sentence of time served is sufficient but not greater than necessary when the facts of this case are factored in using §3553(a).

    1. <u>*Mr. Francisco-Mateo's history and characteristics in considering his sentence.*</u>

Mr. Francisco-Mateo's history is included in his "history and characteristics," part of the statutorily required consideration in the sentencing determination. 18 U.S.C. § 3553(a)(1). There was a time, of course, when district courts were limited in their ability to rely upon circumstances such as age and 'off the book' employment history in arriving at a sentence. That, though, is no longer the case, and sentencing courts are required to consider such factors:

> The Commission has not developed any standards or recommendations that affect sentencing ranges for many individual characteristics. Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public

service are not ordinarily considered under the Guidelines. See United States Sentencing Commission, Guidelines Manual 5H1.1-6, 11, and 12 (Nov. 2006). n3. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider. *See, e.g.*, 18 U.S.C. § 3553(a)(1). *Rita v. United States*, 551 U.S. 338, 364-365 (2007) (Stevens, J. concurring). *See also United States v. Henry*, 1 F. 4th 1315, 1320-21 (11th Cir. 2021); *United States v. Butler*, 729 Fed. Appx. 732, 737 (11th Cir. 2018) quoting *United States v. Hill*, 643 F.3d 807, 880 (11th Cir. 2011) (In determining whether a district court committed a "significant procedural error," we consider several factors, including, among others, whether the district court properly calculated the guideline range, treated the guidelines as advisory, considered the § 3553(a) factors, … Moreover, if, following *Booker*, "a district court applies the guidelines as though they were mandatory or treats the range as presumptively reasonable, that is procedural error."); *United States v. Gibson*, 442 F.Supp.2d 1279 (S.D. FL 2006).

This Court, in arriving at the sentencing decision in this case, must, of course, consult the United States Sentencing Guidelines as the starting point in any sentencing determination and must also consider the other factors set out in § 3553(a). Mr. Francisco-Mateo's age, his lack of a significant criminal history, with his last arrest occurring nearly seven years ago, and his underprivileged upbringing should be a strong consideration in his sentencing.

The United States Sentencing Commission report, *The Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), supports Mr. Francisoco-Mateo's request for a sentence of time served. The findings of the Sentencing Commission's report, Figure 14, shows that the reconviction rate is highest among offenders younger than twenty-one, at 48.5%, and those between the ages of twenty-one to twenty-four years old at 48.4% and declined in each subsequent age grouping, with those who are between 35 and 39 years old at time of release being at 31.3%.

10

Figure 15 in the same report also shows that the re-incarceration rate was highest among those between the ages of 21 to 24 years old (38.6) and declined in each subsequent age group, with those between the ages of 35 to 39 years old at 24.2%.  The report also shows that time to re-incarceration expands with age and the severity of re-incarceration offense declined with age.[7]

Another report by the United States Sentencing Commission, *Measuring Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* (2004), also supports Mr. Francisco-Mateo's request for a time served sentence. Exhibit 9 of the report shows that those similar situated individuals in the 36 – 40 age group at the time of sentencing who fall in criminal history category I, have a recidivism rate of 12.1%, as compared to those, for example, in the 21 to 25 years of age bracket who recidivate at a rate of 42.7% and the under 25 years of age at a rate of 54.7%.[8]

## VI.   <u>Conclusion</u>

Sentencing courts are, of course, charged with the responsibility of treating those that come before them as individuals.  *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify,

---

[7] The Effects of Aging on Recidivism Among Federal Offenders (Published Dec. 7th, 2017) can be found at: <u>www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders</u>
[8] The Sentencing Commission's report, including Exhibit 9, can be found at: http://www.ussc.gov/Research_and_Statistics/Research_Publications/2004/200405_Recidivism_Criminal_History.pdf.

the crime and the punishment to ensue.").  Courts are charged by Congress, as well, to impose a sentence that is sufficient, but not greater than necessary to fulfill the goals of sentencing established by Congress. *See* 18 U.S.C. § 3553(a).

Mr. Francisco-Mateo respectfully requests this Court to follow that tradition and impose a total sentence of time served with a period of supervised release to follow.  This sentence is "sufficient, but not greater than necessary," to achieve the purposes of sentencing set forth in § 3553(a).

Respectfully submitted,

HECTOR DOPICO
FEDERAL PUBLIC DEFENDER


By:      *s/Kafahni Nkrumah*
Kafahni Nkrumah
Assistant Federal Public Defender
Special Bar ID #A5502967
109 North Second Street
Fort Pierce, Florida 34950
Tel:  772-489-2123
E-Mail: Kafahni_Nkrumah@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on September 25, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: ___*s/Kafahni Nkrumah*_____
         Kafahni Nkrumah